**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**MICHAEL ALLEN, 91-A-4771,**

                                    **Plaintiff,**

**v.**

                                                                **13-CV-718(LJV)**

**LT. J. KEANAN,** *et al.*,

                                    **Defendants.**

_____

### REPORT, RECOMMENDATION AND ORDER

Plaintiff commenced this action *pro se* alleging that during his incarceration at Wende Correctional Facility ("Wende"), he was harassed, subjected to gratuitous pat frisk searches and fondled by a correction officer, and falsely charged with prison violations, all in retaliation for reporting that a female correction officer was having sex with inmates and for acting on an inmate grievance committee. Dkt. #1. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983. Dkt. #1. By Decision and Order entered on February 3, 2014 ("Screening Order"), the Hon. Charles J. Siragusa granted plaintiff's motion to proceed *in forma pauperis*, dismissed plaintiff's claims with prejudice against Brian Fischer because plaintiff failed to allege Fischer's personal involvement in the constitutional violations, and terminated Fischer from the case. Dkt. #6.

Plaintiff's complaint asserts claims against the following parties: Kirkpatrick, the former Superintendent of Wende, in his individual capacity (Dkt. #1, ¶ 4); Sticht, Deputy Superintendent of Security at Wende, in his individual capacity (Dkt. #1, ¶ 5); Karen Crowley, Deputy Superintendent of Programs at Wende, in her individual

and official capacities (Dkt. #1, ¶ 6); Meyer, Correction Captain at Wende, in his individual and official capacities (Dkt. #1, ¶ 7); Keenan,[1] Correction Lieutenant at Wende, in his individual and official capacities (Dkt. #1, ¶ 8); Johnson, Correction Sergeant at Wende, in his individual capacity (Dkt. #1, ¶ 9); Demarais, Correction Officer at Wende, in her individual capacity (Dkt. #1, ¶ 10); L. Johnson, Correction Officer at Wende, in her individual capacity (Dkt. #1, ¶ 11); Gore, Correction Officer at Wende, in his individual capacity (Dkt. #1, ¶ 12); and Werner,[2] Correction Officer at Wende, in his individual capacity (Dkt. #1, ¶ 13).[3]

This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1)(A), for all pretrial matters and to hear and report on dispositive motions.  Dkt. #20.  The case was subsequently reassigned to the Hon. Lawrence J. Vilardo on March 8, 2016.  Dkt. #40.  Currently before this Court are Plaintiff's Motion to Compel and for Sanctions (Dkt. #35) and Defendants' Motion for Summary Judgment (Dkt. #36).  For the following reasons, it is ORDERED that plaintiff's motion to compel and for sanctions be denied and it is RECOMMENDED that defendants' motion for summary judgment be granted in part and denied in part.

---

[1] Sticht's name is misspelled "Stitch" and Keenan's name is misspelled "Keanan" in the caption of this case and in various filings by plaintiff.
[2] Werner's name is misspelled "Wener" in the caption of this case.
[3] Dale Artis, the current Superintendent of Wende (Dkt. #1, ¶ 3), was also sued but plaintiff agreed during his deposition to dismiss Artis as a party, as follows:

    A.  I'm not really worried about Artis. If you want to, you can dismiss him. I'll let the record reflect if you want to dismiss Artis, you can dismiss Artis.
    Q  Okay. You're agreeing to voluntarily dismiss --
    A  I'm volunteering and agreeing. No pressure. You can dismiss Artis.
    Q.  Okay.

Dkt. #31, pp. 90-91.
Accordingly, the Clerk of the Court is directed to terminate Artis as a party to this action.

## FACTUAL BACKGROUND

The following facts are taken from the Complaint (Dkt. #1), Defendants'
Statement of Undisputed Facts (Dkt. #36-2), Plaintiff's Statement of Disputed Factual
Issues, and Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary
Judgment (Dkt. #38, p. 29).  Plaintiff is an inmate in the custody of the New York State
Department of Corrections and Community Supervision ("DOCCS"), currently housed at
Attica Correctional Facility.  Dkt #36-2, ¶¶ 2-3; Dkt. #42.  His complaint centers around
events which occurred during his incarceration at Wende, where plaintiff acted as a
member of the Inmate Liaison Committee ("ILC").  Dkt. #36-1, ¶ 11.  As an ILC member,
plaintiff presented grievances from inmates "raised in terms of class actions" to Wende's
Superintendent.  Dkt. #36-2, ¶ 50.

On July 31, 2010, plaintiff alleges that he witnessed a female correction
officer, Anita Demarais, having sex with a Spanish inmate known as "Shagy" on D-Block
where plaintiff was housed.  Dkt. #38, p. 30, ¶ 4.  Plaintiff  observed CO Demarais
engaged in sexual activity with the same inmate on August 5, 2010, at which time
Demarais threated plaintiff that if he reported her she would "set [him] up" and "have
[him] killed in here."  Dkt. #38, p. 30, ¶ 5.  Demarais allegedly told plaintiff, "we're the
police and we do what we want to do."  Dkt. #38, p. 30, ¶ 5.

On August 6, 2010, while plaintiff was checking lights on D-Block
(presumably as part of his duties as a company porter), he happened upon Demarais
once again having sex with Shagy.  Dkt. #38, p. 30, ¶ 6.  Upon seeing plaintiff,

3

Demarais pulled up her pants, escorted plaintiff to the lower floor, and informed the Hall Captain that she "didn't want no ILC reps coming up the stairs un-announce [sic]." Dkt. #38, p. 31, ¶ 6.  Plaintiff, fearing for his life, informed Block Sergeant J. Kruger about Demarais' sexual relationship with Shagy and her threats to have plaintiff killed. Dkt. #38, p. 48, ¶ 64.  Demarais witnessed plaintiff talking to the Sergeant and "to harass [plaintiff] and make threats."  Dkt. #38, p. 31, ¶ 8.  Plaintiff filed a complaint against CO Demarais with the State Police, Wende Commissioner Kirkpatrick, and Wende Deputy Superintendent of Security Sticht on September 2, 2010.  Dkt. #38, p. 31, ¶ 8.  Deputy Sticht thereafter authorized a search of Shagy's cell for any evidence of an inappropriate relationship with Demarais.  Dkt. #38, p. 48, ¶ 65.

Plaintiff alleges that Demarais and other defendants retaliated against him over the next several months for reporting Demarais and for being on the ILC. Specifically, Demarais denied plaintiff a phone call on December 24, 2010 (Christmas Eve) after allowing the whole company access to the phone to call their families. Dkt. #38, p. 31, ¶ 9.  When plaintiff asked Demarais why he wasn't allowed to call his family, Demarais allegedly stated, "over my dead body, you fuckin' snitch."  Dkt. #38, p. 31, ¶ 9.  That same month, Sergeant Johnson told the Hall Captain:  "[Plaintiff] is a company ILC rep.  He stays on 19 Company.  I don't want him running around my fuckin' block.  [CO Demarais] told me [plaintiff] is running up and down these stairs un announce [sic] like he runs this block.  I don't like these ILC reps.  They are a bunch of rats.  I want every ILC rep searched thoroughly when they come into this block." Dkt. #38, p. 31, ¶ 10.

Being an ILC member, plaintiff was privy to "a lot of complaints from the general population concerning harsh frisks and strip searches that were being conducted" by Sgt. Johnson.  Dkt. #38, p. 31, ¶ 11.  According to these complaints, Sgt. Johnson was fondling the penises and caressing the buttocks of inmates during searches.  Dkt. #38, p. 31, ¶ 11.  Plaintiff contends that these complaints were presented to Superintendent Kirkpatrick, Deputy Sticht, and Deputy Superintendent of Programs Crowley, "verbally and in writing, during numerous ILC meetings, [but] they failed to do anything concerning these sexual assault complaints."  Dkt. #38, p. 32, ¶ 11.

DOCCS Directive No. 4910, titled "Control of & Search for Contraband," defines a "pat frisk" search as follows:

> A pat frisk means a search by hand of an inmate's person, and his or her clothes, while the inmate is clothed, except that the inmate shall be required to remove, coat, hat and shoes. . . . **Contact through the clothing with the genitalia, groin, breast, inner thigh and buttocks is a necessary component of a thorough pat frisk.**  However, staff must avoid penetration of the anal or genital opening through the clothing during a pat frisk.  **Staff must not lift or otherwise manipulate the genitalia during a pat frisk.**

Dkt. #38-1, p. 117 (emphasis added).  Directive 4910 authorizes a pat frisk search under the following circumstances, among others:

> A pat frisk shall be made of inmates . . . [w]hen there is an articulable basis to suspect that an inmate may be in possession of contraband; or [a]s directed or authorized by supervisory staff.

> A pat frisk may be made of inmates . . . [g]oing to and returning from housing areas and/or outside work details; and "[e]nroute from program and recreation areas.

Dkt. #38-1, p. 117.

On November 1, 2010, Prisoner's Legal Services of New York, Buffalo ("PLS") authored a letter to then DOCCS Commissioner Fischer, copied to defendants Kirkpatrick and Crowley, about "Unit Wide Allegations of Title II ADA Violations and Assaults and Threats by Staff at the Wende Correctional Facility Sensorially Disabled Program" ("SDP").  Dkt. #38-1, pp. 93-104.  PLS reported that "SDP inmates have notified us that [Wende] correction officers grab SDP inmates' genitals while conducting frisks, particularly, but not exclusively, blind/visually impaired inmates," Dkt. #38-1, p. 99, and that "[r]eports of sexual abuse are significantly higher at Wende than at other correctional facilities in New York."  Dkt. #38-1, p. 100.  The PLS letter was based in part on a report authored by the Correctional Association of New York in 2010 ("2010 Correctional Report").  Dkt. #38-1, p. 100.  Plaintiff was not part of the SDP at Wende (Dkt. #36-2, ¶ 68), but he contends that at the time the 2010 Correctional Report was rendered, the same officers that supervised the SDP inmates were the same officers supervising him:  Sgt. Johnson, CO Gore, and CO Demarais.  Dkt. # 38, p. 44, ¶ 52.

On February 5, 2011, at approximately 10:45 a.m., plaintiff was going from D-Block to the visitation area on a facility pass, when Sgt. Johnson stopped him, asked for his pass and ID card, and told him to face the wall in a pat frisk position.  Dkt. # 38, p. 32, ¶ 12.  When plaintiff asked Sgt. Johnson "why he was harassing me," Johnson stated, "Shut the fuck up!"  Dkt. #38, p. 32, ¶ 12.  According to plaintiff, the following transpired between him and Johnson:

> He took his left hand and went down the left side of my leg and then repeated the same with my right leg and came back up, while he press [sic] his right forearm on my back.  He then put his left hand down the front of my pants and fondle[d] my penis.  At this time I felt sick and humiliated.

> Defendant Johnson stated to me, "You don't like this do you?" I said nothing. He went on to say, "I wish you would come off this wall for I could crack your fuckin head open [sic]." He further went on to say, "I don't like you fuckin ILC cowards and all ILC inmates [have] targets on their back so get used to this." Thereafter, he took his hands off my penis, gave me back my pass and I.D. card and indicated with his right hand for me to process [sic] to the visiting room. He then turned around and stated, "don't think I don't know about my officer you snitched on. Your days here are limited," . . . talking about defendant Demarais.

Dkt. #38, p. 32, ¶ 12. According to his deposition testimony, plaintiff was delayed in the hallway for five minutes, and he was fondled by Johnson "for about ten seconds." Dkt. #36-2, ¶ 17.

Plaintiff, who had been molested as a child, met with his wife, Tonya Allen, in the visitation room "with tears in [his] eyes" and told her "everything that just occurred." Dkt. #38, p. 33, ¶ 14.[4] Plaintiff's wife told him that she would report the incident to the Inspector General's Office in Buffalo ("IG's Office") when she got home, which she did. Dkt. #38, p. 33, ¶ 14; Dkt. #38-1, p. 2, ¶¶ 7-9. Mrs. Allen was told by the IG's Office that it "was receiving a lot of complaints concerning Sergeant Johnson sexually assaulting prisoner[s] at Wende Correctional Facility and they were going to interview [plaintiff] as well as other prisoners." Dkt. #38-1, p. 2, ¶ 9.

On February 5, 2011 around 7:40 p.m., plaintiff was sitting on the bleachers in the gym, when he was called over to door of the weight room, where

---

[4] Plaintiff alleges that to cover up this sexual assault, defendants altered his Visitor Pass to change the time of his arrival to the visitation room from 10:49 to 10:41 a.m. Dkt. #38, p. 32, ¶ 13. Defendants have not relied on the visitor pass in making their motion for summary judgment.

inmates Dozier, Mobley, and Frank verbally complained to plaintiff about CO Demarais turning off the weight room radio. Dkt. #38, p. 33, ¶ 15. Plaintiff instructed the inmates to put their complaints in writing so plaintiff could forward them to the Superintendent. Dkt. #38, p. 33, ¶ 15. As he walked back to the bleachers, plaintiff contends that Demarais was giving him "the evil eye" from behind her desk 15 feet away, but plaintiff did not go near her or say anything to her. Dkt. #38, p. 33, ¶ 15. Thereafter, Sgt. Johnson called plaintiff over to the desk, escorted him out of the gym, and told plaintiff to "get on the wall" for a pat frisk. Dkt. #38, p. 33, ¶ 16. Plaintiff alleges that Sgt. Johnson searched him in the following manner:

> As I was getting on the wall, defendant Johnson, again, placed his right forearm on my back and went down my left leg and right leg. He then put his left hand down my pants and rested it on my penis and began to fondle my penis in a slow and sexual manner. He stated "I told you that ILC inmates are targets and now we're setting you up." He further went on to say "you want to help these low life [sic] by informing on my officers. This ticket is going to put you away for a long time and you can bet on that." He then pulled his hand off my penis and step back [sic] and took out his nightstick and rubbed it up the crack of my buttock, making a motion with the stick as [if] I was having anal sex. My pants were on so it protected me from being penetrated by the stick. While he was doing this, I urinated on myself.

> He told me [to] take my hands off the wall and keep them to my side[s]. He then continu[ed] to walk me back to the block saying, "turn around one time for I could crack your fuckin head open [sic]." As he was saying this, he kept slapping his stick in the palm of his hand.

Dkt. #38, p. 34, ¶ 16. Plaintiff testified at his deposition that Sgt. Johnson's hand was on his penis for "a bit . . . longer than ten seconds, but it felt like ten seconds." Dkt. #36-2, ¶ 20.

Inmate Young, who was present in the gym the evening of

February 5, 2011, submitted an affidavit stating:

> I witnessed Sergeant Johnson put [plaintiff] on the wall, through the gym window door.  **It seem[ed] strange that he was pat frisking him because no prisoners[s] get search[ed] leaving the gym**.
> At this time, I witnessed Sergeant Johnson put his left hand down [plaintiff's] pants.  He was talking to [plaintiff], I couldn't hear what he was saying, but his hand was moving around in [plaintiff's] pants.  Thereafter, I witnessed Sergeant Johnson take his hand out of [plaintiff's] pants and pull out his nightstick.  I thought he was going to hit [plaintiff] in the back of the head, but instead he was moving it back and forth the between his butt area.

Dkt. #38-1, p. 11 (emphasis added).

Plaintiff did not require medical attention on February 5, 2011.  However,

following plaintiff's transfer from Wende, plaintiff sought treatment for erectile

dysfunction and nightmares resulting from his "sexual fondling" by Sgt. Johnson.

Dkt. #36-2, ¶ 22; Dkt. #38-1, p. 26.

Plaintiff contends that on February 6, 2011, he filed a "grievance and a

criminal complaint against defendant Johnson, with the New York State Police,

Inspector [General's] Office, Mental Health Commissioner, and defendants Kirkpatrick

and K. Crowley, requesting to press criminal charges against defendant Johnson for

sexual assault."  Dkt. #38, p. 34, ¶ 18; Dkt. #38-1, pp. 14-16, 18, 20.

As a result of Sgt. Johnson's alleged assault, plaintiff suffered humiliation

and embarrassment and would not leave his cell or cell blocks for two years, except for

"call outs," out of "fear that [Johnson] was going to rape me with his nightstick."

Dkt. #38, pp. 34-35, ¶ 19.  Plaintiff contends instead of going to the mess hall, he ate Commissary food in his cell, Dkt. #38-1, p. 23,[5] and that each time he saw Sgt. Johnson thereafter, he urinated on himself.  Dkt. #38, pp. 34-35, ¶ 19.  Plaintiff alleges that he would have put in for a transfer out of Wende except that he needed to take sex offender treatment to be eligible for parole and according to plaintiff, Wende is "the only facility that has it."  Dkt. #36-3, ¶ 30.  According to defendants, numerous correctional facilities within DOCCS, including four that could accommodate plaintiff, offer sex offender treatment.  Dkt. #36-2, ¶ 31.  Moreover, plaintiff has previously refused to participate in the treatment when it was offered to him.  Dkt. #36-2, ¶ 32.

Plaintiff stated in a medical interview that he was afraid of leaving his cell at Wende for fear of encountering Sgt. Johnson, and indicated that even after his transfer out of Wende, he "was not particularly interested in engaging with other inmates" because of his "past."  Dkt. #38-1, pp. 26-27.  Plaintiff states, "[b]ecause of this incident, emotionally and physically, my penis is not getting an erection and this has cause[d] problems in my marriage."  Dkt. #38, pp. 35, ¶ 19.  "I have nightmares that [Sgt. Johnson] going to rape me."  Dkt. #38, pp. 34-35, ¶ 19.

For his part, "Sergeant Johnson vehemently denies [p]laintiff's allegations."  Dkt. #36-2, ¶ 23.  Johnson admits that he escorted plaintiff from the gym back to the entrance to D-Block on February 5, 2011, but states that he "did not pat frisk

---

[5] Plaintiff's average monthly amount spent on commissary between February 2011 until he transferred out of Wende was $57.75.  Dkt. #36-2, ¶ 29.  While housed at Auburn Correctional Facility ("Auburn") between March 2013 and November 2014, plaintiff spent an average of $53.73 on Commissary items.  Dkt. #36-2, ¶ 29.

or sexually assault plaintiff" at any time.  Dkt. #36-2, ¶ 23.  "Sergeants do not normally

perform pat frisks of inmates," defendants assert, "they supervise corrections officers

that perform pat frisks."  Dkt. #36-2, ¶ 24.


        On February 6, 2011, the same day that plaintiff filed a "grievance and

criminal complaint" alleging sexual abuse by Sgt. Johnson, Dkt. #38, pp. 34-35, ¶ 19,

Demarais authored an "Inmate Misbehavior Report," endorsed by Gore and CO Latasha

Johnson ("L. Johnson"), which charged plaintiff with five violations:  interference with an

employee, demonstration, refusing a direct order, creating a disturbance, and a

movement violation.  Dkt. #38-1, p. 37; Dkt. #38-1, p. 54; Dkt. #36-2, ¶ 40.  Demarais

alleged in the Misbehavior Report the following:

> On the above date and time, as I was attempting to deal with an issue with
> Inmate [Clark], 99A0475, Inmate Allen, 91A4771, jumped up off of the
> bleachers and interfered with my problem with Inmate [Jamal Clark].[6]  I
> gave Inmate Allen the direct order to, "Sit Down," he refused stating, "I am
> an ILC rep," I gave him a 2d direct order to, "Sit Down," he stated "Fuck
> you[,] you White bitch . . ."  He walked off and began to attempt to involve
> the surrounding inmates.  Note: at this time we had approximately 65
> inmates in the gym.  Sgt. Johnson was notified of this incident.

Dkt. #38-1, p. 37.  Gore and L. Johnson endorsed the Misbehavior Report because they

witnessed plaintiff refuse Demarais' direct order to sit down.  Dkt. #36-2, ¶ 40.


        The Tier II hearings relating to the alleged violations by plaintiff and inmate

Clark were conducted by defendant Keenan, who was designated by Superintendent

---

[6] In her declaration in support of defendants' motion for summary judgment, Demarais stated
that "[plaintiff came over to my desk and interjected himself into the conversation."  Dkt. #36-3,
¶ 5.  Inmate Clark submitted an affidavit stating that Lt. Keenan, the officer conducting the
violation hearings, offered to give Clark lesser time for his violation if Clark testified that plaintiff
was "present at the desk."  Dkt. 38-1, p. 39.

Kirkpatrick.  Dkt. #36-2, ¶ 42; Dkt. #38, p. 35, ¶ 22.  The hearing commenced on

February 8, 2011 and concluded on February 17, 2011.  Dkt. #36-2, ¶ 42.  According to

an affidavit from inmate Clark,

> [O]n February 5, 2011, I was keep lock[ed] by officer Demarais, for asking
> her why she turned off the radio in the weight room.  At the time of this
> incident, I did not know [plaintiff], nor did I know why [plaintiff's] name was
> falsely submitted in my misbehavior report. . . .
> [O]n February 8, 2011, I was located [in] the Disciplinary Hearing waiting
> room with inmate Allen.  The staff conducting our hearing was Lt. Keenan.
> I witnessed Lt. Keenan, tell inmate Allen, directly, "You didn't beat the last
> ticket and you won't beat this ticket."  He further went on to say, "I'm
> receiving a lot of pressure from my officer[s] to find you guilty.  You got me
> stuck between a rock and a hard place."
> Lt. Keenan called me into his room and told me that he would give me
> lesser time if I testify that inmate Allen . . . was present at the desk.  Lt.
> Keenan explain[ed]  to me that the real focus is on inmate Allen, because
> he ran his mouth about something that he claim[ed] to have seen [O]fficer
> Demarais do.  Knowing [O]fficer Demarais, and witnessing her have sex
> with [a] Spanish inmate name Shagy that use[d] to lock on my company
> before she had him moved up in 21 company, I knew what Lt. Keenan
> was talking about.

Dkt. #38-1, pp. 39-40.


After the hearing on February 8, 2011, while plaintiff was confined to his

cell pending the charges, he was approached by CO Gore, who stated that he had been

instructed by Lt. Keenan "to fabricate charges against [plaintiff] to keep [him] off the ILC

and further [his] keep lock status."  Dkt. #38, p. 36, ¶ 23.  Officer Gore further advised

plaintiff that Keenan told Gore to lie at the hearing to ensure a guilty verdict against

plaintiff on Demarais' fabricated misbehavior report, a conversation witnessed by an

inmate named Arron Isaiah Young, Sr.  Dkt. #38, p. 36, ¶ 23.  According to Young's

affidavit, when he asked CO Gore, "why is CO Demarais doing Allen like she is?," Gore

replied as follows:

"You and I know she don't like Allen cause he on that ILC . . . Allen caught
her having sex with a Spanish inmate on the third floor and he told the
block Sergeant so now she's trying to get rid of Allen to cover her ass . . . .
I know the ticket is bogus but what can I do[?]  I got to roll with her cause
she's a CO like me . . . . I'm backing her cause she's an officer like me
and I may need her one day.  But I'm gonna try to help Allen out and let
the Lt. know that I ain't hear him call her no white bitch."

Dkt. #38-1, p. 12.  When Young questioned Gore why he would only tell part of the

truth, Gore allegedly replied, "Hey, you don't like the accommodations at this hotel[,]

don't bring your ass here and you won't have to worry about it."  Dkt. #38-1, p. 12.


        Immediately upon learning that Lt. Keenan was soliciting false testimony

from Clark and Gore, plaintiff field a grievance against Keenan, Demarais, Gore and

Johnson for "threats, harassment and conspiring to find [him] guilty at a hearing that

was wholly retaliatory in nature."  Dkt. # 38, p. 36, ¶ 25.  On February 10, 2011,

Lt. Keenan reconvened the hearing but Keenan "wasn't paying attention" because

"could not stop reading the grievance."  Dkt. #38, p. 37, ¶ 28.  When plaintiff complained

that Keenan was fixated on the grievance, Keenan yelled at him.  Dkt. #38, p. 37, ¶ 28.

According to inmate Clark:

        On February 10, 2011, inmate Allen and I were both brought down to the
        Disciplinary Hearing room.  Lt. Keenan  . . . was upset and yelling at
        inmate Allen for filing a grievance against him.  He told inmate Allen, "I see
        why my officer[s] don't like you."

Dkt. #38-1, pp. 39-40


        Officer Gore and inmates Mobley, Crisler, and Clark testified at the

hearing.  Dkt. #38-1, p. 56.  Demarais, who authored the report against plaintiff, did not

testify nor did Keenan request her testimony.  Dkt. #38, pp. 37-38, ¶ 30; Dkt. #38-1,

p. 56.  Gore testified that plaintiff did not say, "Fuck you, you White bitch," and did not

try to "involve other inmates" as Demarais reported.  Dkt. #38, p. 38, ¶ 31.  Lt. Keenan

found plaintiff not guilty of demonstration and creating a disturbance but guilty of

interference with an employee, refusing a direct order, and a movement regulation

violation.  Dkt. #38, p. 37, ¶ 29; Dkt. #38-1, p. 54.  Plaintiff was sentenced to 30 days of

keeplock, with 10 days suspended, and loss of recreation, packages, commissary,

phone and personal TV for a period of 30 days.  Dkt. #36-2, ¶ 44.  Plaintiff filed an

appeal with Kirkpatrick and Sticht, but "they fail[ed] to remedy the wrong."  Dkt. #38,

p. 38, ¶ 32.  Plaintiff did not challenge the outcome of the Tier II hearing in state court.

Dkt. #36-2, ¶ 46.[7]


On March 9, 2011, Demarais allegedly called plaintiff a "nigger" in front of

C-Block and stated, "You're going to catch a bad one real soon."  Dkt. #38, pp. 38-39,

¶ 33.  Plaintiff filed another grievance against Demarais for threatening him in retaliation

for "reporting her criminal conduct that happen[ed] in D-Block on 22-21 company on

August 5 [and] 6 of 2010."  Dkt. #38, p. 39, ¶ 33; Dkt. #38-1, p. 59.

---

[7] Plaintiff explicitly disclaims any due process challenge relating to the Tier II hearing conducted
by Lt. Keenan.  Dkt. #36-2, ¶ 47.  At his deposition, plaintiff answered questions about the Tier II
hearing as follows:
Q:    Did you appeal the disciplinary hearing, the Tier 2 hearing against you that was
      conducted by Lieutenant Keenan?
A     Yes, I did appeal. And I didn't take it further because under federal law you don't really
      have to take it any further because I'm not raising a due process issue. I'm raising a
      First Amendment issue, so therefore, I did not -- I did not have to go and appeal to the
      Courts and do all that other stuff like that.
Q     Okay. So you're not -- you're not alleging that there were any due process violations in
      that hearing?
A     No, there's none whatsoever. I did not raise no due process issues.  Dkt. #31, p. 100.

In June of 2011, plaintiff was moved from D-Block to C-Block, Demarais'
post, where she "started telling all the C-Block officers that [Allen] was a 'snitch.'"
Dkt. #38, p. 39, ¶ 34.  In December of 2012, plaintiff was approached by an inmate
named Martinez, who asked plaintiff to stay in his cell so Martinez could have sex with
Demarais.  Dkt. #38, p. 39, ¶ 35.  Plaintiff expressed his concern to Martinez that "if he
have sex with [Demarais] while I'm locking on this company, she will set me up because
she knows I been writing her up."  Dkt. #38, p. 39, ¶ 35.  Plaintiff thereafter witnessed
Demarais and Martinez having sex in the mop room.  Dkt. #38, p. 39, ¶ 35.  On
December 29, 2012, plaintiff filed a confidential complaint with Wende Superintendent
Artis about Demarais' sexual activity with Martinez.  Dkt. #38, p. 39, ¶ 36; Dkt. #38-1,
pp. 61-62.  Therein, plaintiff asked Artis to "act on this information as soon as possible
before [Demarais] set [him] up."  Dkt. #38-1, pp. 61-62.  Plaintiff was thereafter fired
from his porter job on C-Block, allegedly as a result of Demarais telling the C-Block
officers that he was a snitch.  Dkt. #38, p. 40, ¶ 37.

On February 27, 2013, Demarais allegedly approached plaintiff in the
visiting room and stated, "I know you been writing up front and telling on me.  Your days
here are numbered."  Dkt. #38, p. 40, ¶ 38.

Demarais was eventually interviewed by the I.G.'s Office regarding
plaintiff's complaints.  Demarais "categorically" denied having sexual relations with
inmates, Dkt. #36-3, ¶ 4, and informed the IG's Office that she did not feel comfortable
having inmate Allen on C-Block because he had made "sexually suggestive comments"

15

about her.  Dkt. #36-3, ¶¶ 9-10.  At some point after she was interviewed, Demarais told

plaintiff, "You want to be a snitch and write me up, now I'm setting you up and you will

be transfer[red] out of this facility."  Dkt. #38, p. 40, ¶ 41.

To transfer an inmate from one facility to another within the DOCCS, the

Deputy Superintendent or his superior must authorize the transfer and the Office of

Classification and Movement must approve it.  Dkt. #36-2, ¶ 59.  According to Deputy

Sticht, he was instructed by the IG's Office on February 27, 2013, to transfer Allen out of

C-Block and to place him in administrative segregation pending his transfer out of

Wende.  Dkt. #36-11, ¶ 4.  Capt. Meyer contends that he was directed to serve

administrative segregation papers on plaintiff.   Dkt. #36-2, ¶ 61.[8]  Plaintiff was

thereafter moved and placed in administrative segregation without his personal

property.  Dkt. #38, p. 41, ¶ 42.

On February 28, 2013, plaintiff's personal property was returned, but the

lawsuit plaintiff had prepared against Demarais, Johnson, Gore, and Keenan was

missing.  Dkt. #38, p. 41, ¶ 43.  Included in this missing paperwork was plaintiff's draft

lawsuit and affidavits from "all of the inmates defendant Demarais was having sex with

throughout the facility," including testimony that Demarais had agreed to exchange oral

sex to have plaintiff assaulted.  Dkt. #43, p. 41, ¶ 43.  Plaintiff alleges that it was CO

Werner who took his legal paperwork while packing plaintiff's cell.   Dkt. #38, p. 41,

---

[8] Capt. Meyer authored plaintiff's administrative segregation papers on March 1, 2013, and
recommended that plaintiff be placed in administrative segregation "based on an ongoing
investigation being conducted by the Office of the Inspector General."  Dkt. #14, p. 191;
Dkt. #38-1, p. 83.  "This was a result of a phone call from the IG's Office in Albany informing me
of there [sic] investigation."  Dkt. #14, p. 191.

¶ 45.  Although he had difficulty discerning Werner's signature on the "Contraband

Sheet," Dkt. #38-1, pp. 71, 78, Werner responded to plaintiff's grievance regarding the

theft of his legal papers, asserting that he transferred all of plaintiff's property except for

an expired bag of medication, as stated on the Sheet.  Dkt. #36-2, ¶ 64; Dkt. #38, p. 41,

¶ 45; Dkt. #38-1, p. 79.


According to the Affidavit of inmate Charles Coleman, after plaintiff's cell

was packed up, Demarais gave Coleman "a legal document that appear[ed] to be [a]

1983 law suit application that [plaintiff] was preparing to file against her for retaliation

and sexual assault against Sergeant Johnson."  Dkt. #38-1, p. 81.  Coleman further

alleges:

> [CO] Demarais informed me that she obtain[ed] those documents from
> officer Werner, during the packing of [plaintiff's] cell on February 27, 2013.
> She then called [plaintiff] a 'snitch' and stated that [plaintiff] is not going to
> be able to file any law suit against her because she got his paper work.

Dkt. #38-1, p. 81.


Plaintiff contends that he was never interviewed by the IG's Office and

never had a hearing relating to Capt. Meyer's recommendation.  Dkt. 38, p. 42, ¶ 46.

Plaintiff alleges that he confronted Capt. Meyer about allowing Demarais to fabricate

false statements against him, and Meyer replied:

> "Us officers stick together.  I know her statements was [sic] false, and I
> know what my officers do isn't right but don't think we are going to allow
> you to keep writing her up and we wasn't going to come after you.  You
> been around a long time now and you know how things go.  Your [sic] be
> leaving here any day now and maybe you [sic] think twice before you write
> up another officer."

Dkt. # 38, p. 42, ¶ 47.  Inmate William Milo Walker, Jr. witnessed this conversation and filed an affidavit confirming plaintiff's version of events.  Dkt.#38-1, p. 85.  Defendant Meyer alleges that when he made the recommendation for plaintiff's administrative segregation he was not aware of inmate Allen's complaints about Demarais. Dkt. #36-2, ¶ 56.  He denies telling plaintiff that he was being retaliated against. Dkt. #36-2, ¶ 62.

Plaintiff was transferred from Wende to Auburn Correctional Facility on March 23, 2013.  Dkt. #36-2, ¶ 12.

Plaintiff commenced this *pro se* action pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution on July 10, 2013.  Dkt. #1, pp. 19-21. He has asked for punitive and compensatory damages.  Dkt. #1, ¶¶ 21-22.  Plaintiff moved to compel defendants to disclose the IG's report and for sanctions on September 22, 2015.  Dkt. #35.  Defendants moved for summary judgment against all causes of action in plaintiff's complaint on October 2, 2015.  Dkt. #36.

## DISCUSSION AND ANALYSIS

**Motion to Compel and For Sanctions**

Plaintiff asks this Court to sanction defendants for "intentionally withholding" the IG's report regarding Demarais' alleged relations with inmates at Wende. (Dkt. #35). Defendants submitted a copy of the IG's report to this Court for *in camera* review on August 28, 2015, prior to moving for summary judgment. Defendants argue that disclosing the report to plaintiff would present a grave security risk to inmates who made statements to the IG's Office. Defendants have agreed that if plaintiff survives summary judgment and counsel is appointed for him, they will turn over a copy of the report on an attorneys-eyes-only basis, subject to the execution of an acceptable confidentiality agreement.

This Court has reviewed the report and agrees that turning it over to plaintiff as he proceeds *pro se* would create a security risk. Redaction of the document would not likely protect the identities of these inmates. Moreover, the report would be of minimal value in defending against defendant's motion for summary judgment, as it focuses on whether Demarais had inappropriate relations with inmates, and not whether she orchestrated retaliatory acts against plaintiff for reporting that she did. Defendants' motion for summary judgment makes no reference to the materials contained in the IG's report, and instead relies on publicly-filed affidavits and evidence. Plaintiff has capably defended against defendants' motion for summary judgement resulting in this Court's recommendation, set forth below, that defendants' motion be denied in substantial part. There is nothing in the IG's report that would have salvaged the claims against those

defendants for whom summary judgment has been recommended.  As such, it cannot

be said that plaintiff has been prejudiced by not having the report to defend against

defendants' motion for summary judgment.  For this reason, plaintiff's motion to compel

and for sanctions (Dkt. #35) is denied.


**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*,

502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).  A party seeking to defeat a motion for summary judgment:

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


## 42 U.S.C. § 1983

Plaintiff brings his complaint under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted).  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Id.*  Here, plaintiff claims that defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the Constitution of the United States.  Dkt. #10.

**First Amendment Retaliation**

The First and Fourteenth Amendments protect prison inmates who file grievances from retaliation by prison officials, and such retaliation is actionable under 42 U.S.C. § 1983. *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 236 (S.D.N.Y. 2005). However, because claims of retaliation can be invoked with "relative ease," *Cannon v. Wood*, No. 9:10-CV-01332 (GTS/RFT), 2013 WL 838299, at *4-6 (N.D.N.Y. Jan. 22, 2013), *report and recommendation adopted,* No. 9:10-CV-1332 (GTS/RFT), 2013 WL 838294, at *3 (N.D.N.Y. Mar. 6, 2013), courts should examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001) (stating that "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act"), *overruled on other grounds by Swierkewicz v. Sorema,* 534 U.S. 506 (2002); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996).

To establish a First Amendment retaliation claim, an inmate must show that: (1) he was engaged in constitutionally protected activity; (2) the defendants took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004). The plaintiff bears the initial burden to show that a defendant's actions were improperly motivated.

"Adverse action" is retaliatory conduct "that would deter a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Barrington v. New York*, 806 F. Supp. 2d 730, 745 (S.D.N.Y. 2011) (internal citations omitted). If it would not, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. In deciding whether particular conduct constitutes adverse action, courts should bear in mind that "[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433-34 (S.D.N.Y. 2010).

To satisfy the third prong, a prisoner must present evidence from which a court could infer that defendants acted with an improper motive. A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon,* 58 F.3d at 872-73; *see also Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir. 2003) (holding that plaintiff met his burden by presenting circumstantial evidence that defendant correction officers filed disciplinary charges against him just as he was settling a lawsuit against the correctional facility and the disciplinary charges were subsequently reversed as unfounded).

**Eighth Amendment**

"[W]hen the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. U.S. Const. Amend. VIII; *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991).

To prevail on an Eighth Amendment claim, an inmate must satisfy both a subjective and an objective element. Subjectively, an inmate must show that the defendants acted with a "sufficiently culpable state of mind." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992). Generally speaking, "[a] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate safety.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). That is, "the official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

To meet the objective element, a plaintiff must demonstrate that the conduct was objectively "harmful enough" or "sufficiently serious" to implicate the Constitution. *Hudson*, 503 U.S. at 8, 20. The objective analysis is necessarily "context specific," *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013), and "depends upon the

claim at issue." *Hudson,* 503 U.S. at 8.  Although not "every malevolent touch by a prison guard gives rise to a federal cause of action," when an official engages in conduct that is "repugnant to the conscience of mankind," "incompatible with evolving standards of decency," or which involves "the unnecessary and wanton infliction of pain" he violates the Eighth Amendment.  *Id.* at 9-10 (quoting *Estelle v. Gamble,* 429 U.S. 97, 102-3 (1976)).

In *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997), the Second Circuit Court of Appeals held that sexual abuse by a corrections officer may violate the Eighth Amendment if it is "severe or repetitive."  105 F.3d at 861.  That is, a single incident of sexual abuse, if sufficiently severe or serious, may constitute cruel and unusual punishment, and less severe but repetitive conduct may still be 'cumulatively egregious' enough to violate the Constitution.  *Boddie*, 105 F.3d at 861.  "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment."  *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015).  An inmate need not show physical injury to prevail on an Eighth Amendment sexual abuse claim.  *Id.*

As the *Crawford* Court explained:

In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate. *See Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (explaining that the Eighth Amendment analysis turns on

"whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" (internal quotation marks omitted)); *accord Hudson,* 503 U.S. at 6-7, 112 S.Ct. 995 (same).

To be sure, prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches. *Bell v. Wolfish,* 441 U.S. 520, 560, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Indeed prison security and safety may require frequent searches of an intensely personal nature—and not every such search is properly the subject of a lawsuit. Searches that do not uncover contraband may be no less penologically justified than those that do. And even an officer who is meticulous in conducting a search does not violate an inmate's constitutional rights as long as the officer had no intention of humiliating the inmate or deriving sexual arousal or gratification from the contact. But a search may not be undertaken maliciously or for the purposes of sexually abusing an inmate. *See Hudson v. Palmer,* 468 U.S. 517, 528, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

*Id.*, 796 F.3d 252, 257-58.


**Fourteenth Amendment**

A prisoner's right to reasonable access to the courts is guaranteed by the First and Fourteenth Amendments. *See, e.g., Lewis v. Casey,* 518 U.S. 343, 346 (1996); *Bounds v. Smith,* 430 U.S. 817, 828 (1977). That right is implicated when prison authorities "actively interfer[e] with [an] inmate's attempt to prepare legal documents." *Lewis,* 518 U.S. at 350. Although "the mere deprivation of personal property" might not rise to the level of a constitutional violation, the "intentional obstruction of a prisoner's access to the courts is precisely the sort of oppression that the Fourteenth Amendment and section 1983 are intended to remedy." *Franco v. Kelly*, 854 F.2d 584, 588 (2d Cir. 1988).

A claim that prison staff intentionally interfered with a prisoner's right of access to court requires a showing of "relevant actual injury." *Arce v. Walker*, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999). That is, in addition to showing interference, a prisoner "must go one step further and demonstrate that [prison practices] hindered his efforts to pursue a legal claim." *Id.* (citing *Lewis*, 518 U.S. at 351).

**Plaintiff's Claims**

Plaintiff contends that defendants retaliated against him in various ways for reporting Officer Demarais' sexual misconduct and for being on the ILC. Specifically, plaintiff alleges that Sgt. Johnson fondled him during two gratuitous pat frisks of his person; Demarais threatened and harassed him; Demarais, Gore, and L. Johnson fabricated charges against him; Lt. Keenan found him guilty without any evidence; and Meyer and Sticht placed him in administrative segregation and transferred him out of Wende. Dkt. #10. Plaintiff alleges that Sgt. Johnson's, pat frisks during which Johnson fondled plaintiff in a sexual manner, violated his right to be free from cruel and unusual punishment; and Kirkpatrick, Crowley, and Sticht's failure to remedy the systemic sexual abuse of prisoners at Wende further violated plaintiff's Eighth Amendment rights. Plaintiff asserts that Demarais and Werner intentionally obstructed his access to the courts by stealing his draft Section 1983 lawsuit.

**Sexual Abuse by Sgt. Johnson**

*First Amendment Retaliation Claim*

Plaintiff has presented evidence that he was an active member of the ILC and that he reported Demarais' sexual relationship with inmate Shagy and her threats to harm plaintiff to her superior, Sgt. J. Kruger.  As an ILC member, plaintiff brought formal grievances to Wende officials on behalf of other inmates in the prison population.

Several courts have held that membership on such a committee is protected by the Constitution.  *See Gill v. Riddick*, No. CIV. 9:03-CV-1456, 2005 WL 755745, at *9-10 (N.D.N.Y. Mar. 31, 2005) (reasoning that "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them); *Alnutt v. Cleary,* 913 F. Supp. 160, 169 (W.D.N.Y. 1996) (holding that an inmate has a protected First Amendment right to "engage in his duties as IGRC representative without fear of reprisal or retaliation"); *Morrison v. Lefevre,* 592 F. Supp. 1052 (S.D.N.Y.1984) (holding that the plaintiff inmate stated a cause of action where he alleged retaliation for providing assistance to other prisoners in filing lawsuits); *McCorkle v. Walker,* 871 F. Supp. 555 (N.D.N.Y. 1995) (holding that the inmate stated a claim where he alleged that a prison nurse filed false charges against him in retaliation for his informing prison officials that she was the nurse on duty when another inmate nearly drowned in infirmary); *Payne v. Axelrod,* 871 F. Supp. 1551 (N.D.N.Y. 1995) (holding that the inmate stated cause of action where he alleged that a razor blade was planted in his cell

in retaliation for reporting that a corrections officer set a fire in another inmate's cell); *McDonald v. Hall,* 610 F.2d 16 (1st Cir. 1979) (holding that the inmate stated a cause of action where he alleged that he was transferred in retaliation for filing suits against prison officials, and for giving legal assistance to other inmates); *McCorkle v. Juchenwicz,* No. 94 CIV. 6363(TPG), 1999 WL 163205, at *1 (S.D.N.Y. Mar. 23, 1999) (upholding an inmate's right to serve on the ILC and citing *Alnutt,* in support of the ruling that "an inmate grievance committee representative has a constitutional right to seek redress of the grievances of other inmates without fear of retaliation"); *Maurer v. Patterson,* 197 F.R.D. 244, 247 n. 3 (S.D.N.Y. 2000) (noting in the context of deciding a Rule 50 motion for judgment as a matter of law that an inmate has a protected right to engage in duties as an IGRC representative); *Garrett v. Reynolds,* No. Civ. 9:99-CV-2065(NAM/GLS), 2003 WL 22299359, at *4 (N.D.N.Y Oct. 7, 2003) (citing *Alnutt* for the proposition that an inmate has a "constitutional right to be protected from retaliation based upon his activities as an IGRC representative"). This Court finds that plaintiff's membership on the ILC satisfies the "constitutionally protected activity" requirement of his retaliation claim.

Likewise, plaintiff's report to Sgt. Kruger about Demarais constitutes protected activity. Filing grievances against prison officials falls squarely within the category of constitutionally protected activity. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996); *Franco,* 854 F.2d at 590; *Vega v. Artus*, 610 F. Supp. 2d 185, 206 (N.D.N.Y. 2009). Defendants contend that because plaintiff reported Demarais orally and not in writing to Sgt. Kruger, his grievance was not protected activity. This Court

disagrees.  The record reflects that plaintiff's report was sufficiently formal to trigger an investigation into Demarais' relationship with inmate Shagy, prompting Deputy Sticht to authorize a search of the inmate's cell.  Dkt. #38, p. 48, ¶ 65.  That the plaintiff's initial complaint was not in writing does not change the seriousness of his allegations or the risks of reprisals to plaintiff for reporting officer misconduct.

With respect to Sgt. Johnson, plaintiff has presented evidence that Johnson took adverse action against him by sexually molesting him during two gratuitous pat frisk searches.  Plaintiff has offered proof of a causal connection between his protected activity and Sgt. Johnson's molestation; that is, Sgt. Johnson's statements while fondling plaintiff's penis, "all ILC inmates [have] targets on their back so get used to this," "don't think I don't know about my officer you snitched on," "I told you ILC inmates are targets and now we're setting you up," and "you want to help these low life [sic] by informing on my officers."  Dkt. #38, p. 32, ¶ 12; Dkt. #38, p. 34, ¶ 16. Sgt. Johnson's vehement denial, Dkt. #36-2, ¶ 23, and defendants' statement that Sergeants "do not normally conduct pat frisks," Dkt. #36-2, ¶ 24, do not refute plaintiff's proof.  Rather, this Court finds that genuine issues of material fact exist as to whether Sgt. Johnson fondled plaintiff and whether he did so because plaintiff was an ILC member and/or because he reported Demarais' misconduct.  These genuine issues should preclude summary judgment in defendant Johnson's favor on plaintiff's First Amendment retaliation claim.

Eighth Amendment

Plaintiff has presented evidence that Sgt. Johnson conducted two pat frisk searches of plaintiff's person, during which Sgt. Johnson put his hands down plaintiff's pants and fondled his penis and rubbed his night stick between his buttocks.  This evidence is sufficient to survive defendants' motion for summary judgment on plaintiff's Eighth Amendment claim.  Sgt. Johnson's alleged conduct, if proven, is unquestionably "repugnant to the conscience of mankind" and therefore violates the Eighth Amendment.  *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir. 1999) (holding that a prison guard who repeatedly stepped on a prisoner's penis acted "contrary to contemporary standards of decency"); *Washington v. Hively,* 695 F.3d 641, 643 (7th Cir. 2012) (stating that "[a]n unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant"); *Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir. 2000) (stating that "[a] sexual assault on an inmate by a guard - regardless of the gender of the guard or of the prisoner - is deeply offensive to human dignity").

As an initial matter, on this record, there was no legitimate reason for Sgt. Johnson to pat frisk plaintiff on either the morning or evening of February 5, 2011.  On the morning of February 5th, plaintiff was walking from his cell to the visiting area on an authorized pass.  Defendants have not alleged that there was an articulable basis to suspect that plaintiff was in possession of contraband and, therefore, the circumstances did not authorize a search under DOCCS Directive 4910.  Dkt. #38-1, p. 117.  That

evening, plaintiff was in the gym when Sgt. Johnson called him to the hallway to conduct a frisk. While plaintiff could have been considered "enroute from a recreation area," possibly authorizing a search under Directive 4910, inmate Young affirmed that it was not the practice at Wende to search prisoners leaving the gym. Dkt. #38-1, p. 11 (stating that "no prisoners get searched leaving the gym"). Even if a search was justified, Sgt. Johnson's conduct in fondling plaintiff's penis violated Directive No. 4910's unequivocal language that, "[s]taff must not lift or otherwise manipulate the genitalia during a pat frisk." Dkt. #38-1, p. 117. That is because there is no legitimate law enforcement or penological purpose for fondling an inmate's penis or rubbing a nightstick between an inmate's buttocks, and Sgt. Johnson does not argue otherwise.

Defendants contend that plaintiff's Eighth Amendment claim must fail because plaintiff did not seek immediate medical attention. As previously noted, an inmate need not show physical injury to succeed on an Eighth Amendment sexual assault claim. *Crawford*, 796 F.3d at 258. Even if some injury was required, plaintiff has offered evidence in the form of medical records that, as a result of Sgt. Johnson's assault, plaintiff suffers from erectile dysfunction, anxiety, and residual nightmares. Defendants attempt to rebut plaintiff's claim that for fear of encountering Sgt. Johnson, plaintiff did not go to the mess hall at Wende and instead ate commissary food in his cell. Specifically, they offer evidence that he spent the same amount on commissary food after he was transferred to Auburn as he did at Wende after his alleged assault. However, plaintiff's medical records show that he complained to medical personnel that

his "past" at Wende stifled his interest in "engaging with other inmates" even after his transfer to Auburn.  Dkt. #38-1, pp. 26-27.

Defendants also suggest that the assault never occurred because plaintiff did not put in for a transfer, and that his reason for not doing so – needing sex offender treatment to be eligible for parole – is bogus.  However, it is not a legal requirement that a prisoner who has been assaulted must put in for a transfer to another facility to corroborate his fears of a further assault.  The record shows that plaintiff reported the incident to Superintendent Kirkpatrick and Deputy Crowley, the IG's Office, and the New York State Police, among others, seeking redress for Sgt. Johnson's assaults on him.  Dkt. #38, p. 34, ¶ 18; Dkt. #38-1, pp. 14-16, 18, 20.  Under the circumstances, the fact that plaintiff did not seek a transfer does not belie his claim that Sgt. Johnson assaulted him.

In the alternative, defendants argue that Sgt. Johnson is entitled to qualified immunity because *Crawford* was only recently decided and Sgt. Johnson's conduct would have been reasonable under the former standard articulated in *Boddie*. This Court does not agree.  Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A law is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what

he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even under *Boddie*, "no amount of gratuitous . . . fondling of an inmate's genitals . . . even if limited in duration or conducted through the inmate's clothes . . . is permitted by the Constitution." *Crawford*, 796 F.3d at 259. As such, qualified immunity is not available to Sgt. Johnson.

For all of these reasons, genuine issues of material fact exist as to whether Sgt. Johnson fondled plaintiff's penis, rubbed his buttocks with his nightstick, and did so for the purpose of humiliating and/or threatening the plaintiff. These issues should foreclose summary judgment in Sgt. Johnson's favor on plaintiff's Eighth Amendment claim.

## Failure to Remedy Pervasive Sexual Assault by Wende Correction Officers by Kirkpatrick, Crowley and Sticht

Plaintiff asserts that defendants Kirkpatrick, Crowley and Sticht allowed Sgt. Johnson and others to sexually assault inmates, including himself, during pat frisks. These are egregious circumstances which, if proven, would constitute cruel and unusual punishment. As previously noted, to be liable for deliberate indifference an "official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway*, 37 F.3d at 66.

Defendants argue that they lack any personal involvement in the sexual assault on plaintiff and, therefore, are not responsible for any constitutional violations

arising from Sgt. Johnson's actions.  This Court does not agree.  Defendants are correct

that a defendant must be personally involved in an alleged constitutional deprivation for

a plaintiff to be awarded damages under 42 U.S.C. § 1983.  *Gaston v. Coughlin*, 249

F.3d 156, 164 (2d Cir. 2001)*; Colon*, 58 F.3d at 873; *Al-Jundi v. Estate of Rockefeller*,

885 F.2d 1060, 1065 (2d Cir. 1989).  However, a plaintiff may demonstrate a

defendant's personal involvement by evidence that: (1) the defendant participated

directly in the alleged constitutional violation; (2) the defendant, after being informed of

the violation through a report or appeal, failed to remedy the wrong; (3) the defendant

created or permitted the continuation of a policy or custom under which unconstitutional

practices occurred; (4) the defendant was grossly negligent in supervising subordinates

who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference

to the rights of inmates by failing to act on information indicating unconstitutional acts

were occurring.  *Colon*, 58 F.3d at 873.


At least three of those circumstances are implicated by plaintiff's evidence

that:  Kirkpatrick, Sticht, and Crowley had been informed "verbally and in writing" that

Wende correction officers were sexually assaulting prisoners during pat frisk searches,

and that Sgt. Johnson was a frequent perpetrator of these assaults (Dkt. #38, p. 31, ¶

11); Kirkpatrick and Crowley were copied on the PLS letter reporting that COs were

fondling inmates' genitals and rubbing inmates' buttocks during pat-frisks on Wende's

SDP Unit (Dkt. #38-1, p. 10); and Sgt. Johnson, Gore, and Demarais supervised the

SDP inmates (Dkt. #38, p. 44, ¶ 52).  This evidence is sufficient to create a genuine

issue of fact as to whether Kirkpatrick, Sticht, and Crowley were aware of the risk that

plaintiff, who was also in the charge of Sgt. Johnson, could be assaulted in a sexual

manner but did nothing to remedy the situation.  For this reason, it is recommended that

defendants' motion for summary judgment on plaintiff's Eighth Amendment failure to

protect claim be denied.


**Threats and Harassment by Demarais**

Plaintiff offers evidence that in retaliation for reporting her, Demarais:

denied plaintiff a phone call to his family on Christmas Eve; called him a "nigger;" told

plaintiff "you['re] gonna catch a bad one real soon," and "your days here are numbered;"

and told everyone on C-Block that plaintiff was a "snitch," which resulted in plaintiff

getting fired from his porter job.  Dkt. #38, pp. 38-40, ¶¶ 33, 34, 37**.**


While some verbal threats can constitute adverse action, numerous district

Courts within the Second Circuit have held that nebulous or vague threats of violence,

such as the ones alleged here, are insufficient to establish a First Amendment

retaliation claim.  *See, e.g., Keitz v. Kickbush*, No. 13-CV-6284 CJS, 2015 WL 1579228,

at *3 (W.D.N.Y. Apr. 9, 2015) (holding that a deputy's conduct in screaming at prisoner

plaintiff "[I]'m not afraid to fight, in fact . . . I'll kick your . . ." while approaching plaintiff in

a menacing manner with fists clenched was insufficient to support a constitutional

violation); *Carl v. Griffin,* No. 08 Civ. 4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2,

2011) (holding that "[d]efendants' alleged 'threats' and/or 'harassment' of Plaintiff were

also insufficiently direct or specific to deter an ordinary inmate from exercising his first

amendment rights"); *Rosales v. Kikendall,* 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010)

(holding that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim") (citing *Cabassa v. Smith,* No. 08 Civ. 480, 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009)); *Mateo,* 682 F. Supp. 2d at 432-433, 434 (finding no "adverse action" where corrections officer twice threatened inmate with physical violence for writing grievances, including one incident where the officer entered the inmate's cell, "held his right gloved fist [to the inmate's] face, [and] threatened [him] by saying that one day he and [the inmate-plaintiff] would party").

The "opacity" of Demarais' threats to plaintiff – that plaintiff was "gonna catch a bad one soon" and that his "days here are numbered" – "softens the deterrent effect considerably."  *Mateo,* 682 F. Supp. 2d at 434-35 (reasoning that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); s*ee also Kemp v. LeClaire,* No. 03-0844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding that threats like "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are not adverse actions); *Bartley v. Collins,* 95-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell,* 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (holding that "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance" do not constitute adverse action).

Calling plaintiff a "snitch," without more, does not constitute adverse action.[9] *Suarez v. Kremer*, No. 03-CV-809, 2008 WL 4239214, at *12 (W.D.N.Y. Sept. 11, 2008) (holding that incident in which the defendant CO called prisoner plaintiff a "snitch" did not rise to the level of a constitutional violation); *Dawes,* 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant," combined with plaintiff's conclusory allegations that the references exposed him to assault from other inmates, were insufficient to support a claim for retaliation). Likewise, calling plaintiff a name, even a reprehensible slur like "nigger," is not actionable absent any appreciable injury. *See, e.g., Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) (holding that name-calling, without any appreciable injury, is not a constitutional violation); *Edwards v. Horn*, No. 10 CIV. 6194 RJS JLC, 2012 WL 473481, at *14 (S.D.N.Y. Feb. 14, 2012), *report and recommendation adopted*, No. 10 CIV. 6194 RJS JLC, 2012 WL 760172 (S.D.N.Y. Mar. 8, 2012) (holding the same).

---

[9] Plaintiff contends that he was fired from his porter job because Demarais told everyone on C-Block that he was a "snitch." However, the record reflects that over two years passed between the time that plaintiff first reported Demarais to Sgt. Kruger in the Summer of 2010 (Dkt. #38, p. 48, ¶ 64) and when he was terminated from his job as a porter after December 29, 2012 (Dkt. #38, p. 39, ¶ 36-37). At the latter time, plaintiff had been housed on Demarais' post, C-Block, for more than a year and half serving as a company porter. Given the temporal attenuation between these events, it does not appear to this Court that plaintiff was fired from his job because Demarais labelled him a "snitch."

Plaintiff also alleges that Demarais tried to have him assaulted by other inmates at Wende, but he does not identify any particular inmate whom Demarais may have solicited to hurt him. More significantly, plaintiff does not allege that he was actually harmed by an inmate at Demarais' behest.

While Demarais' alleged conduct in denying plaintiff a phone call to his family on Christmas Eve may be considered uncharitable, "restrictions on phone use do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases), *report and recommendation adopted*, 2011 WL 5006831 (S.D.N.Y. Oct. 20, 2011); *Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1998) (holding that inmates "have no right to unlimited telephone calls). Based on the foregoing, it is recommended that defendants' motion for summary judgment be granted in favor of Demarais, but only with respect to plaintiff's First Amendment claim of retaliatory threats and harassment.

**False Misbehavior Report by Demarais, Gore, and L. Johnson and Guilty Verdict by Keenan**

While an inmate has no constitutional protection against false accusations, he does have a right not to be retaliated against for exercising his constitutional rights. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco,* 854 F.2d at 589-90. Here, plaintiff has presented evidence that: (1) he reported Demarais' misconduct to her superior; (2) Demarais and Gore (and possibly L. Johnson) conspired to falsify charges against him; and (3) Lt. Keenan attempted to solicit false testimony from inmate Clark and CO Gore so as to find plaintiff guilty. There are facts in this record from which a reasonable juror could infer that nearly all of the defendants, with the exception of L. Johnson, acted with improper motive in drafting or endorsing the misbehavior report and finding plaintiff guilty: Gore's statement to inmate Young that he knew Demarais'

statement was false but he would testify that plaintiff had refused a direct order (Dkt. #38-1, p. 12); the fact that Gore ultimately testified that plaintiff did not in fact say to Demarais, "Fuck you, you white bitch," or try to involve other inmates as alleged in the Misbehavior Report (Dkt. #38, p. 38, ¶ 31); Keenan's statement that he was between a rock and hard place with pressure to find plaintiff guilty (Dkt. #38-1, pp. 39-40); and inmate Clark's statement that Lt. Keenan offered to give him lesser time if he lied and said that plaintiff had come up to Demarais' desk (Dkt. #38-1, pp. 39-40). The facts that Lt. Keenan did not call Demarais as a witness and that plaintiff was ultimately exonerated of the more serious charges suggest that the Misbehavior Report was falsified, at least in part.

Defendants, for their part, dispute that they acted with retaliatory motives. But on this record, there are genuine issues of fact as to whether Demarais, Gore, and Lt. Keenan acted with retaliatory motives in filing the Misbehavior Report and in finding plaintiff guilty. With respect to L. Johnson, not to be confused with Sgt. Johnson, she has stated that she endorsed the Misbehavior report because she witnessed plaintiff refusing Demarais' order to sit down. Dkt. #36-2, ¶ 40. Plaintiff has presented no evidence that L. Johnson knew that plaintiff had previously reported Demarais, or that she endorsed the report in retaliation for his conduct. For this reason, it is recommended that summary judgment be granted in L. Johnson's favor on this claim.

**Theft of Lawsuit by Werner and Demarais**

Plaintiff contends that Werner and Demarais stole his draft lawsuit against Demarais and that they did so in retaliation for plaintiff exercising his First Amendment rights.  Although "the taking of an inmate's papers will often interfere with an inmate's right of access to courts," *Goff v. Nix,* 113 F.3d 887, 892 (8th Cir. 1997), the Court may not presume harm, and some showing of impaired access is required.  *Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir. 1997).  A prisoner's conclusory assertion that he suffered prejudice does not suffice to support an access to court claim.  *Boswell v. Mayer,* 169 F.3d 384, 387 (6th Cir.1999).  Rather, he must designate "specific facts showing a genuine issue for trial."  *Arce*, 58 F. Supp. 2d at 44-45 (quoting *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996)).

Plaintiff does not allege that he was prevented from filing his lawsuit, attending any court appearance, or meeting a deadline imposed by the Court.  He has capably defended against defendants' motion for summary judgment.  Although plaintiff states that he is missing affidavits from inmates who had sexual relations with Demarais, he does not identify any of the witnesses by name or describe their alleged involvement in the case. Nor does he describe their expected testimony or how such testimony was likely to affect the outcome of the case.  As stated before, whether Demarais had sexual relations is not a central issue.  It is undisputed that plaintiff reported that Demarais was engaged in inappropriate sexual relations with inmates, and the focus of this Court's concern is whether plaintiff was framed and sexually assaulted as a consequence of that report.  Because plaintiff has failed to show any prejudice

arising from the alleged theft of his legal papers, it is recommended that defendants' motion for summary judgment be granted with respect to his First and Fourteenth Amendment theft of lawsuit claim.

**Administrative Segregation and Transfer by Sticht and Meyer**

Plaintiff contends that he was placed in administrative segregation in retaliation for reporting Demarais' misconduct. While Sticht and Meyer may have been aware of plaintiff's complaint against Demarais, the record makes clear that Sticht ordered plaintiff moved and transferred at the request of the IG's Office. Dkt. #36-11, ¶ 4. In this respect, their conduct in carrying out the IG's request was not retaliatory in nature, even if it did result from plaintiff reporting Demarais. For this reason, it is recommended that defendants' motion for summary judgment be granted as to his First Amendment administrative segregation retaliation claim.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to compel and for sanctions (Dkt. #35) is DENIED.

It is RECOMMENDED that defendants' motion for summary judgment (Dkt. #36) be GRANTED IN PART and DENIED IN PART, as follows:

Defendant Sgt. Johnson's motion for summary judgment on plaintiff's First Amendment retaliation claim be DENIED.

Defendant Sgt. Johnson's motion for summary judgment on plaintiff's Eighth Amendment sexual assault claim be DENIED.

Defendants Kirkpatrick, Crowley, and Sticht's motion for summary judgment on plaintiff's Eighth Amendment failure to protect claim be DENIED.

Defendant Demarais' motion for summary judgment on plaintiff's First Amendment retaliation claim based on threats and harassment be GRANTED.

Defendants Demarais, Gore, L. Johnson, and Keenan's motion for summary judgment on plaintiff's First Amendment retaliation claim based on the misbehavior report and guilty finding be DENIED, except as to L. Johnson, for whom summary judgment should be GRANTED, and L. Johnson be terminated as a party to this action.

Defendant Werner and Demarais' motion for summary judgment on plaintiff's First and Fourteenth Amendment theft of lawsuit claim be GRANTED, and Werner be terminated as a party to this action.

Defendant Sticht and Meyer's motion for summary judgment on plaintiff's First Amendment retaliation claim based on his administrative segregation and transfer be GRANTED, and Meyer be terminated as a party to this action.

The Clerk of the Court is directed to terminate Artis as a party to this action.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

**SO ORDERED.**

**DATED:**     **Buffalo, New York**
        **August 24, 2016**

                    <u>**s/H. Kenneth Schroeder, Jr.**</u>
                    **H. KENNETH SCHROEDER, JR.**
                    **United States Magistrate Judge**